UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HERITAGE VINTAGE INVESTMENTS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 15 C 05582 |
| v. | ) ) ) | Judge Edmond E. Chang |
| KMO DEVELOPMENT GROUP, INC.; CAROLINA BUENO, LLC; BRUCE G. BOLZLE; and GREG D. OWENS, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Greg Owens filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.[1] *See* R. 15, Mot. to Dismiss.[2] This motion has already been the subject of two previous Opinions by the Court. *See* R. 34, 12/11/15 Opinion; R. 57, 3/30/16 Opinion. The first Opinion, issued in December 2015, ordered the parties to submit supplemental briefs and affidavits specifically addressing which of Owens's contacts, if any, with Illinois—the forum state—related to the negotiation and execution of Owens's *personal* guaranties, as possibly distinct from agreements with the corporate defendants. 12/11/15 Opinion at 15. The second Opinion, issued in March 2016, ordered an evidentiary hearing to resolve important factual disputes raised by the supplemental materials. *See*

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332.
[2]Citations to the Court's docket are labeled as "R." followed by the docket number and applicable page or paragraph number. The exhibits ("Pl.'s Exh." and "Def.'s Exh.") refer to exhibits that were introduced at the evidentiary hearing on September 21, 2016.

3/30/16 Opinion at 14. It further denied Owens's motion to dismiss without prejudice, with the chance to renew the motion after the evidentiary hearing. *Id.*

The evidentiary hearing was held on September 21, 2016. *See* R. 73, 9/21/16 Minute Entry. At the hearing, affiants Michael Christie and Mark Glazer testified on behalf of Plaintiff Heritage Vintage Investments, LLC, and Owens testified on his own behalf. *See* R. 79, 9/21/16 Hearing Tr. at 3. Afterward, both parties submitted post-hearing briefs to support their positions. *See* R. 80, Def.'s Post-Hearing Br.; R. 81, Pl.'s Post-Hearing Br. Based on the evidentiary record, the Court concludes that it has specific personal jurisdiction over Owens, so Owens's motion to dismiss is denied.

**I. Background**

Many of the facts underlying Owens's motion to dismiss have already been set forth in the prior Opinions, *see* 12/11/15 Opinion; 3/30/16 Opinion, so only the most pertinent facts will be set forth here. Heritage filed this lawsuit to enforce two promissory notes it had issued to Defendant KMO Development Group, Inc. and Defendant Carolina Bueno, LLC, as well as to enforce two individual guaranties in which Owens and Defendant Bruce Bolzle personally guaranteed the KMO Development note and the Carolina Bueno note.[3] *See* R. 1-1, Summons & Compl. Heritage claims that KMO Development and Carolina Bueno have both defaulted on their loans, and seeks, among other things, judgment against Owens on his personal guaranties. *See id.*

---

[3]Heritage initially filed this case in the Circuit Court of Cook County, Illinois, but Owens filed a timely notice of removal to federal court. *See* R. 1, Notice of Removal.

Owens moved to dismiss the case against him under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Mot. to Dismiss. Owens argued that (1) this Court lacks both general and specific jurisdiction over him, (2) he is protected by Illinois's fiduciary-shield doctrine, and (3) the KMO Development guaranty includes a forum-selection clause that requires suit to be brought in Oklahoma. *See* R. 16, Def.'s Br. In the December 2015 Opinion, the Court held that Heritage had failed to establish that Owens is subject to general jurisdiction in Illinois, but the Court rejected Owens's fiduciary-shield and forum-selection arguments. *See* 12/11/15 Opinion at 7-9, 12-14. The Court ultimately believed more information was needed to determine whether it has specific jurisdiction over Owens:

> The parties' broadly worded and conclusory affidavits do not give the Court enough information to decide the dispute over personal jurisdiction. In order for the Court to determine whether Owens, as an individual, is properly before this Court, Heritage must provide the Court with evidence (if it has any) showing that Owens's *personal guaranties* arose from Owens's contacts with Illinois.

*Id.* at 12. In order to get more information on the personal guaranties, the Court ordered the parties to file supplemental briefs and affidavits focused on "the nature, extent, and location of the negotiations that occurred between Heritage and Owens *on Owens's personal guaranties* (not on the transaction documents generally)." *Id.*

In compliance with the order, the parties filed supplemental briefs and affidavits focused on the initiation, negotiation, and execution of the KMO Development and Carolina Bueno guaranties. *See* R. 38, Pl.'s Supp. Br.; R. 38-2, 12/28/15 Christie Supp. Aff.; R. 38-3, 12/28/15 Glazer Supp. Aff.; R. 53, Def.'s Supp.

3

Br.; R. 53-1, 1/27/16 Owens Supp. Aff.; R. 55, Pl.'s Supp. Reply Br.; R. 55-1, 2/8/16 Christie Second Supp. Aff. These filings offered materially different accounts of how and where the personal guaranties were initially mentioned, discussed, and agreed to. Heritage's supplemental submissions suggested that Owens personally negotiated and agreed to both of the personal guaranties during face-to-face meetings with Christie and Glazer in Park Ridge, Illinois. Pl.'s Supp. Br. at 1; 12/28/15 Christie Supp. Aff. ¶¶ 5-7; 12/28/15 Glazer Supp. Aff. ¶¶ 5-7; 2/8/16 Christie Second Supp. Aff. ¶¶ 4-9. In contrast, Owens's supplemental submissions asserted that both guaranties were discussed and agreed to during phone calls between Christie and Owens—while Owens was in his office in Oklahoma—that preceded the face-to-face meetings in Illinois. Def.'s Supp. Br. at 2-3; 1/27/16 Owens Supp. Aff. ¶¶ 6-7. To the extent that the guaranties were mentioned at the face-to-face meetings, it was only to reiterate what had already been said over the telephone for Glazer's benefit. Def.'s Supp. Br. at 3; 1/27/16 Owens Supp. Aff. ¶ 7.

Because the parties' submissions created a dispute over facts pertinent to the specific-jurisdiction determination, the Court decided to hold an evidentiary hearing. 3/30/16 Opinion at 1, 14. During that hearing, Christie and Glazer testified for Heritage, Owens testified for himself, and the parties each introduced a handful of exhibits. *See generally* 9/21/16 Hearing Tr. In lieu of closing arguments, the Court requested that the parties file concise post-hearing briefs, *id.* at 104-05, which they did.

## II. Findings of Fact

Having considered the testimony and evidence offered at the evidentiary hearing, and having reviewed the post-hearing briefs, the Court now resolves all pertinent factual disputes to decide the personal jurisdiction question.

### A. KMO Development Group Personal Guaranty

Sometime in or around 2001, Christie and Owens met at an entrepreneurial coaching program called "The Strategic Coach." 9/21/16 Hearing Tr. at 7 (Christie Testimony); *id.* at 62 (Owens Testimony). The two struck up a friendship that ultimately developed into a business relationship: Owens became the president of KMO Development, and Christie and Glazer formed Heritage Capital Investments[4] to provide capital funding for KMO Development's single-tenant restaurant build-to-suit business. *Id.* at 8-9 (Christie Testimony); *id.* at 42 (Glazer Testimony); *id.* at 62-63 (Owens Testimony). Christie ran the administrative and management side of Heritage, and Glazer provided the capital. *Id.* at 9 (Christie Testimony); *id.* at 44 (Glazer Testimony).

Several years into their business relationship, the Chief Financial Officer of KMO Development, Mike Francis, called Christie to ask whether he thought Glazer would consider making an operating loan for KMO Development to expand its business. 9/21/16 Hearing Tr. at 9-10, 20 (Christie Testimony); *id.* at 44 (Glazer Testimony). Christie told Francis that Christie would have to speak to Glazer. *Id.* at 10, 20 (Christie Testimony). When Christie and Glazer conferred, Glazer said that

---

[4]Heritage Capital Investments is same entity as Heritage Vintage Investments; the corporation's name changed in or around 2011. 9/21/16 Hearing Tr. at 8 (Christie Testimony).

he would consider making the loan, but that he wanted to discuss the matter with Owens and Bolzle[5] in person at an upcoming meeting.[6] *Id.* at 10 (Christie Testimony). Glazer wanted to speak with Owens and Bolzle about the loan in person because it was very different from previous financial dealings between Heritage and KMO Development: it was an operating loan—not a capital contribution for a build-to-suit deal—and it involved roughly four times more money than any previous deal had. *Id.* at 44-45, 48 (Glazer Testimony); *see also id.* at 67 (Owens Testimony). Christie testified that he called Francis back and "said that Dr. Glazer would be open minded, he had a lot of questions and concerns, and he would like to talk face-to-face when they were in town." *Id.* at 11; *see also id.* at 21. On cross, Christie admitted that he told Francis that Glazer "would require collateralization or a personal guaranty or both, depending on what was backing the loan." *Id.* at 21.

This is where Heritage's and Owens's factual accounts diverge: Christie testified that, between his phone calls with Francis and the face-to-face meeting, he did not discuss the matter with Owens. 9/21/16 Hearing Tr. at 11, 20. Owens testified, however, that he and Christie discussed the loan over the phone after Christie's initial conversation with Francis and before the in-person meeting. *Id.* at 68. According to Owens, during their phone conversations, Christie informed him

---

[5] Bolzle was the Executive Vice President of KMO Development. *Id.* at 62 (Owens Testimony).

[6] Christie, Glazer, Owens, and Bolzle regularly met—sometimes in Illinois, sometimes in Oklahoma—to review ongoing real estate development business. *Id.* at 10-12, 23-24 (Christie Testimony); *id.* at 46 (Glazer Testimony); *id.* at 64-67 (Owens Testimony).

6

that Glazer would require a personal guaranty, and the two discussed the terms of the loan. *Id.* at 68-70.

The parties generally agree that, in mid to late June 2006, Christie, Glazer, Owens, and Bolzle met at Christie's office in Park Ridge, Illinois. 9/21/16 Hearing Tr. at 11-12 (Christie Testimony); *id.* at 45-46 (Glazer Testimony); *id.* at 70 (Owens Testimony). But they offer different accounts of what happened at the meeting. Christie and Glazer testified that Owens and Bolzle presented their desire for the loan and offered an 18-percent interest rate, to be paid monthly. *Id.* at 13 (Christie Testimony); *id.* at 47 (Glazer Testimony). Glazer then said he would need collateral or a personal guaranty to make the loan. *Id.* at 13 (Christie Testimony); *id.* at 46-48 (Glazer Testimony). When Owens and Bolzle each offered to execute a personal guaranty, Glazer requested "personal financial statements and tax returns before [he would] finalize approval." *Id.* at 14 (Christie Testimony); *see id.* at 46-47 (Glazer Testimony). Discussion of the loan concluded with "a handshake agreement contingent on [Glazer] receiving the financial statements and tax returns, and [being] comfortable that there was [sic] enough . . . resources to repay the loan." *Id.* at 14 (Christie Testimony); *see id.* at 49-50 (Glazer Testimony).

In contrast, Owens testified that any conversation at the meeting about the loan and the personal guaranty was "very perfunctory." 9/21/16 Hearing Tr. at 69; *see also id.* at 70 ("I remember it as being at the very tail end of the meeting and a very brief conversation."). The personal guaranty requirement—which Christie had already mentioned to Owens over the phone—was simply "reiterated." *Id.* at 70. The

7

foursome did not discuss or negotiate any of the particular terms of the guaranty. *Id.* at 74.

Christie testified that, sometime after the meeting, KMO Development provided him with "a draft of a promissory note as well as financial statements and tax returns." 9/21/16 Hearing Tr. at 14. Christie forwarded the documents to Glazer, and Glazer decided that he wanted to go ahead with the loan. *Id.* at 15-16 (Christie Testimony); *id.* at 50 (Glazer Testimony). Christie, however, informed Francis that KMO Development would need to provide a separate personal guaranty form; the promissory note contained a personal-guaranty signature line but Glazer and Christie wanted "an actual guaranty form." *Id.* at 15-16 (Christie Testimony); *see* Pl.'s Exh. 1 at 2 (including signature lines for Francis, Owens, and Bolzle under a heading entitled "<u>GUARANTORS</u>"). Neither Christie nor Glazer could remember whether it was KMO Development or Heritage that ultimately drafted the personal guaranty form that was used,[7] *see* 9/21/16 Hearing Tr. at 16, 24-25 (Christie Testimony); *id.* at 59 (Glazer Testimony), but a form was created by someone and later completed by Owens in Oklahoma, *see* Pl.'s Exh. 2; *see also* 9/21/16 Hearing Tr. at 25 (Christie's Testimony). Upon receipt of the executed note and personal guaranties, Heritage funded the loan. *See* 9/21/16 Hearing Tr. at 16 (Christie Testimony).

---

[7]Christie and Glazer did state, however, that regardless of who generated the guaranty form, they do not think that the parties attempted to specifically negotiate any of the terms included in the form. *See id.* at 27 (Christie Testimony); *id.* at 59 (Glazer Testimony).

8

Owens testified that both the note and the personal guaranty were provided to him to sign by Heritage sometime after the in-person meeting in Illinois. *See* 9/21/16 Hearing Tr. at 72, 74 (Owens Testimony). There was no negotiation over the terms contained in the guaranty form. *Id.* at 74 (Owens Testimony); *see also id.* at 27 (Christie Testimony); *id.* at 59 (Glazer Testimony). Owens executed the personal guaranty in Oklahoma, and electronically sent the completed form to Christie. *Id.* at 74 (Owens Testimony).

On consideration of the evidence, the Court credits the version of events offered by Christie and Glazer and finds that the KMO Development guaranty was negotiated and agreed upon at the face-to-face meeting in Park Ridge, Illinois. As an initial matter, Glazer provided a credible motivation for wanting to discuss the loan and the guaranty *in person* before reaching an agreement: this deal was starkly different from the previous deals that KMO Development and Heritage had made. 9/21/16 Hearing Tr. at 44-45, 48. Instead of requesting a capital contribution for a build-to-suit project, KMO Development requested an operating loan that involved a significant amount of money. *Id.* Owens's testimony corroborates this. *See id.* at 67. In addition, all three witnesses testified that neither the note nor the personal guaranty was physically brought to the face-to-face meeting. *See id.* at 24 (Christie Testimony); *id.* at 48-49 (Glazer Testimony); *id.* at 84-85 (Owens Testimony). Rather, both were prepared and signed afterward. *See id.* at 49-51 (Glazer Testimony). If the parties had agreed to the personal guaranty requirement over the phone *before* the meeting (as Owens claims), then one would think that the

9

documents would have been ready to go by the time of the meeting. The fact that they were not undermines Owens's assertions that he agreed to execute a guaranty (and that Heritage agreed to accept it) when he spoke to Christie on the phone, and that any discussion of the guaranty at the meeting was "very perfunctory," *see id.* at 69. Thus, the Court finds that the KMO Development guaranty was discussed and agreed upon while Owens was in Illinois.

**B. Carolina Bueno Personal Guaranty**

Separate from the KMO Development loan, on January 23, 2007, Owens emailed Christie requesting an equipment loan and offering personal guaranties. *See* Pl.'s Exh. 7 ("We have financing needs for equipment in our joint venture restaurants in the greater Charlotte market. . . . This would be a fully amortizing loan, *with personal guarantees* [sic] from [Bolzle] and [Owens]. . . ." (emphasis added)); 9/21/16 Hearing Tr. at 17-18 (Christie Testimony). Christie testified that he told Owens that Owens would need to discuss the matter in person with Glazer. 9/21/16 Hearing Tr. at 18. Glazer, Christie, Bolzle, and Owens subsequently met at Christie's office in Park Ridge, at which time Bolzle and Owens pitched the loan's terms—five years, self-amortizing—and offered their personal guaranties. *Id.* at 18, 36-37 (Christie Testimony); *see id.* at 51-52 (Glazer Testimony). Because this was a large, longer-term loan, Glazer wanted to speak to a family member about financing the loan with him. *Id.* at 18, 37 (Christie Testimony); *id.* at 54 (Glazer Testimony). So, at the conclusion of their discussion, "there was a handshake reached subject to .

10

. . tightening up the terms." *Id.* at 18 (Christie Testimony); *see also id.* at 53 (Glazer Testimony).

On January 25, 2007, Christie emailed Owens to tell him that Glazer had approved the funding. *See* Def.'s Exh. 11; *see also* 9/21/16 Hearing Tr. at 30. This email detailed the proposed terms for the loan. See Def.'s Exh. 11. Little more than an hour later, Owens sent an email to Christie in reply, confirming that the proposed terms "work[] great." *Id.* (Because the second and third emails followed the first by only two days, Christie testified on cross that the face-to-face meeting "must have happened on the 24th." 9/21/16 Hearing Tr. at 33; *see also id.* at 34.) Shortly thereafter, KMO Development sent a signed note and Owens's personal guaranty to Heritage. *See id.* at 38 (Christie Testimony); *id.* at 54-55 (Glazer Testimony).

In sharp contrast to Christie's and Glazer's testimony, Owens testified that no face-to-face meeting occurred between the January 23 and January 25 emails.[8] *See* 9/21/16 Hearing Tr. at 77-79, 90, 94. To the extent that Christie and Owens spoke between the emails, it was over the phone. *See id.* at 77-79. And Owens did not speak with Glazer about this loan at all. *Id.* at 79, 90. Following the January 25 email, Heritage provided Owens with the guaranty form; at no time were its terms discussed or negotiated. *Id.* at 82. Owens executed the personal guaranty in Oklahoma. *Id.*

---

[8]Owens acknowledged that his January 27, 2016 affidavit stated that there was an in-person meeting at Park Ridge on January 23, 2007. *See id.* at 92; *see also* 1/27/16 Owens Supp. Aff. He testified, however, that this date was first provided by Christie's and Glazer's affidavits, and that subsequent review of the January 23 and January 25 emails refreshed his recollection. *See* 9/21/16 Hearing Tr. at 93-94.

11

On consideration of the evidence, the Court credits the version of events offered by Owens, and finds that a face-to-face meeting at which the parties discussed and agreed to the Carolina Bueno guaranty *did not* occur. Rather, the January 23 and January 25 emails, *see* Pl.'s Exh. 7; Def.'s Exh. 11, show that the loan and guaranty were discussed and agreed upon via email—and possibly telephone—only. Indeed, the content of the emails does not support Christie's contention that the in-person meeting "must have happened on the 24th," 9/21/16 Hearing Tr. at 33. First, Owens's January 23 email—which proposes the loan and the guaranty—says "look forward to talking with you tomorrow." Pl.'s Exh. 7. This phrasing is more suggestive of an anticipated phone call than of an in-person meeting. Second, the January 25 emails make no mention of any discussion, in person or otherwise, that occurred on January 24. *See* Def.'s Exh. 11. Instead, Christie's email sets out proposed terms—as if the parties have not yet discussed proposed terms—and Owens's follow-up accepts those terms. *Id.* These are not the types of emails one would expect to see following an in-person meeting of the sort described by Christie and Glazer. Thus, the Court finds that the Carolina Bueno guaranty was discussed and agreed to remotely, not in person in Illinois.

### III. Legal Standard

Rule 12(b)(2) governs dismissals for lack of personal jurisdiction. Fed. R. Civ. P. 12(b). A complaint need not allege personal jurisdiction, but the plaintiff bears the burden of establishing that jurisdiction is proper once a defendant moves to dismiss on that ground. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338

F.3d 773, 782 (7th Cir. 2003). When a motion is based solely on the submission of written materials, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009). But when there is a dispute in those written materials about the facts necessary to rule on the issue, the Court must grant discovery and hold an evidentiary hearing. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In the latter scenario, the plaintiff bears a heavier burden; the plaintiff must "prove what it alleged," *id.*, and establish personal jurisdiction by a preponderance of the evidence, *Purdue*, 338 F.3d at 782.

## IV. Conclusions of Law

The previous Opinions have already comprehensively discussed background principles of personal jurisdiction, *see* 12/11/15 Opinion at 6-7, 9-10; 3/30/16 Opinion at 5-7, so only the most pertinent principles are set forth here. When a federal district court sits in diversity, it "has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction." *Purdue*, 338 F.3d at 779. In Illinois, a court has personal jurisdiction over a nonresident defendant if Illinois's long-arm statute authorizes jurisdiction, and if asserting jurisdiction does not violate the Fourteenth Amendment's Due Process Clause. *Hyatt*, 302 F.3d at 713. Because Illinois's "long-arm statute permits the exercise of jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause," the two inquiries merge, *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010); 735 ILCS 5/2-209(c), and a court may exclusively analyze

13

federal due process limitations on personal jurisdiction, *Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). Federal due process requires that a defendant have sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

"The nature of the defendant's contacts with the forum state determines the propriety of personal jurisdiction and also its scope—that is, whether jurisdiction is proper at all, and if so, whether it is general or specific to the claims made in the case." *Tamburo*, 601 F.3d at 701. This Court has already determined that Owens's contacts are not "so continuous and systematic," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted), as to give rise to general jurisdiction, 12/11/15 Opinion at 7-9. It has yet to decide whether Owens's contacts with Illinois are sufficient to give rise to specific jurisdiction.

Specific jurisdiction is proper when a defendant directs his activities at the forum state and the cause of action arises from or relates to those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Put differently, "there must be some showing that the defendant purposefully availed [him]self of the privilege of conducting activities within the forum state." *Purdue*, 338 F.3d at 780; *see id.* at 780-81 ("[T]he Supreme Court repeatedly has asked whether the defendant has deliberately engaged in significant activities within the forum state, or whether [he]

14

has created continuing obligations between [him]self and a resident of the forum." (citations omitted)). "In applying this broad standard, the Supreme Court has found that contacts supporting specific jurisdiction can take many different forms." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). The key is purposefulness: "[t]he due process clause will not permit jurisdiction to be based on contacts with the forum that are random, fortuitous, or attenuated." *Id.*

With respect to contractual disputes, "contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum." *Purdue*, 338 F.3d at 781; *see also Burger King*, 471 U.S. at 478. Rather, to determine whether a party to a contract purposefully established minimum contacts within the forum, a court must "place the contract in the context of the entire transaction of which it is a part." *Purdue*, 338 F.3d at 781. This requires examination of "'prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other.'" *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 493 (7th Cir. 2014) (quoting *Purdue*, 338 F.3d at 781). To that end, federal courts have considered factors such as: (i) which party initiated the transaction, *Heritage House Rests., Inc. v. Cont'l Funding Grp., Inc.*, 906 F.2d 276, 283 (7th Cir. 1990); (ii) where negotiations took place, *O'Hare Int'l Bank v. Hampton*, 437 F.2d 1173, 1176-77 (7th Cir. 1971); (iii) where the contract was executed, *id.* at 1177; *Cont'l Bank, N.A. v. Everett*, 964 F.2d 701, 703 (7th Cir. 1992); (iv) where performance was to take place, *Cont'l Bank, N.A.*, 964 F.2d at 703; *O'Hare Int'l Bank*, 437 F.2d at 1177; and (v) whether the contract

included a choice-of-law provision, *Cont'l Bank, N.A.*, 964 F.2d at 703; *O'Hare Int'l Bank*, 437 F.2d at 1177. *See also MAC Funding Corp. v. Ne. Impressions, Inc.*, 215 F. Supp. 2d 978, 981 (N.D. Ill. 2002). Here, the factors weigh in favor of the exercise of personal jurisdiction over Owens.

### A. KMO Development Group Personal Guaranty

Heritage argues that Owens is subject to this Court's specific jurisdiction because Owens purposefully availed himself of the privilege of conducting business in Illinois. *See* Pl.'s Post-Hearing Br. at 1-2. With respect to the KMO Development guaranty, Heritage points out that (1) Owens came to Illinois to negotiate the underlying loan, and during the Illinois meeting the personal guaranty requirement was discussed and agreed to, *see id.* at 2-4, and (2) the loan contains an Illinois choice-of-law provision, *id.* at 6. Owens disagrees. He points out that Heritage suggested the personal guaranty requirement, and that Owens executed the guaranty in Oklahoma (not Illinois). *See* Def.'s Post-Hearing Br. at 5-6. Having balanced the factors for and against a finding of specific jurisdiction, the Court concludes that Heritage has shown by a preponderance of the evidence that Owens is subject to specific jurisdiction in Illinois with regard to the KMO Development guaranty.

Here, the facts—as found in the Findings of Fact section above, *see supra* Section II.A.—demonstrate that Owens "purposefully directed" his conduct toward Illinois, *N. Grain Mktg.*, 743 F.3d at 493, such that he could "reasonably anticipate being haled into court" in Illinois, *World-Wide Volkswagen Corp. v. Woodson*, 444

16

U.S. 286, 297 (1980). Heritage first mentioned the personal guaranty over the phone, *see* 9/21/16 Hearing Tr. at 9-10, 20, 44, but Owens ultimately discussed and agreed to provide the guaranty while meeting with Christie and Glazer in Illinois, *see id.* at 13-14, 46-50. *See NUCOR Corp. v. Aceros y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580-81 (7th Cir. 1994) (finding personal jurisdiction where initial negotiations occurred via telephone but detailed discussion occurred in the forum state). Owens, Bolzle, Christie, and Glazer did not negotiate the specific terms of the personal guaranty form at this meeting (or at any other time), *see* 9/21/16 Hearing Tr. at 27, 59, 74, but they did discuss Glazer's desire to see Owens's financial information, *see id.* at 14, 46-47, and they did ultimately end the conversation with the understanding that Owens would execute a personal guaranty—and Glazer would make the loan—so long as Glazer found Owens's financial situation acceptable, *see id.* at 14, 49-50. Owens's visit to Illinois was thus "significant in the formation of the contract." *See Wis. Elec. Mfg. Co., v. Pennant Prods., Inc.*, 619 F.2d 676, 678 (7th Cir. 1980) (finding personal jurisdiction where two of the defendant's agents visited the forum state "during negotiations to determine, by inspecting [the plaintiff's] facilities there, whether it would be able to able to perform the contract, and later, while the contract was being performed, to negotiate with [the plaintiff] about performance").

What's more, the underlying note contains an Illinois choice-of-law provision and requires performance in Illinois. *See* Pl.'s Exh. 1. These facts further show that Owens invoked the benefits and protection of the forum state. Though the guaranty

17

is itself silent as to choice of law and location of performance, the guaranty and the note here "were part of an interrelated package dedicated to one overarching goal," *see RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1279 (7th Cir. 1997): as a general matter, the guaranty secured the note, *see* Pl.'s Exh. 2, and, in this particular case, there would be no note but for the guaranty and there would be no guaranty but for the note. Glazer expressly testified to this effect.[9] *See* 9/21/16 Hearing Tr. at 56. And Christie's testimony regarding the "<u>GUARANTOR</u>" section of the note corroborates Glazer's testimony. *See id.* at 14-16 (testifying that KMO initially sent Christie a draft of the note and financial documents, and that the note contained "a personal guaranty line" but that Glazer and Christie were not used to seeing this and insisted upon a separate guaranty form). Because the note and the loan are closely linked, the note's Illinois connections must be considered in the jurisdictional analysis.

Together, the discussion that occurred during the meeting in Park Ridge and the note's Illinois connections are sufficient minimum contacts for specific jurisdiction. The Court finds that the combined force of these contacts with Illinois outweighs the fact Heritage initiated the personal guaranty requirement and the fact that Owens ultimately executed the guaranty in Oklahoma. The Court thus concludes that Heritage has met its burden and shown by a preponderance of the evidence that Owens purposefully availed himself of the privilege of conducting business in Illinois.

---

[9]"Q: And finally, with regard to [the KMO Development] loan, would you have given that loan without the personal guaranty that was discussed at that meeting in June of 2006? A: No." *Id.* at 56.

## B. Carolina Bueno Personal Guaranty

Heritage also argues that Owens is subject to this Court's specific jurisdiction with regard to the Carolina Bueno guaranty. *See* Pl.'s Post-Hearing Br. Even though the Court does not believe that Owens traveled to Illinois to discuss this guaranty with Christie and Glazer in person, *see supra* Section II.B., the Court concludes that a preponderance of the evidence shows that Owens purposefully availed himself of the privilege of conducting business in Illinois during the course of the Carolina Bueno transaction.

Owens did not travel to Illinois to suggest, negotiate, or execute the Carolina Bueno guaranty, *see supra* Section II.B., but a defendant's presence in the forum state is "by no means essential" to a determination that that defendant is subject to specific jurisdiction, *Purdue*, 338 F.3d at 781; *see Burger King*, 471 U.S. at 476; *Heritage House*, 906 F.2d at 283. Indeed, if a "defendant's efforts are directed toward a particular jurisdiction, the fact that the actor did not actually enter the jurisdiction is not of crucial importance." *Purdue*, 338 F.3d at 781. Here, it is obvious that Owens's efforts were directed at Illinois: it was he who contacted Christie via email to offer his personal guaranty in exchange for an equipment loan. *See* Pl.'s Exh. 7; *see also Heritage House*, 906 F.2d at 284 (finding personal jurisdiction where defendant "knowingly . . . reached out to [the plaintiff] and created a continuing relationship or obligation"). This is strong evidence of purposeful availment.

In addition, the Carolina Bueno note contains an Illinois choice-of-law provision and requires performance in Illinois (just like the KMO Development note). *See* Pl.'s Exh. 3. The link between the Carolina Bueno note and guaranty is especially strong—Owens expressly signed the note as a guarantor in his personal capacity, *see* Pl.'s Exh. 3 at 2—so the note's Illinois connections are another pertinent contact between Owens and the forum state.

Ultimately, Owens's initiation of the personal guaranty and the note's Illinois connections are sufficient minimum contacts for specific jurisdiction. The Court concludes that a preponderance of the evidence shows that Owens purposefully directed his conduct toward Illinois such that he could foresee litigation in Illinois.

## V. Conclusion

For the reasons discussed above, Owens's motion to dismiss for lack of personal jurisdiction, R. 15, is denied. Owens shall answer the complaint by November 7, 2016. The status hearing of November 3, 2016 remains in place to set the remainder of the discovery schedule, and in the meantime, the parties shall start settlement negotiations as well.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: October 24, 2016